EGBERT H. DUDLEY et al., Respondents and Appellants, *v.* EVELINA B. PERKINS et al., as Executors of GEORGE W. PERKINS, Deceased, Appellants and Respondents.

**Principal and agent — special agent cannot bind his principal in a matter beyond or outside the power conferred — party dealing with such agent is bound to know extent of his authority.**

1. Large incidental powers flow from a general agency, but a narrow limit of incidental authority attaches to a special agency. A special agent cannot bind his principal in a matter beyond or outside the power conferred, and the party dealing with the special agent is bound to know the extent of his authority and the burden is upon him to show that the agent had the authority that he assumed to exercise.

2. Defendant's testator entered into a contract with plaintiffs by which they agreed to sort, grade, load and ship potatoes delivered to them by farmers who had contracted to grow and sell them to defendant's testator. The plaintiffs were to pay the producers for them and were to be paid for their work and be reimbursed for moneys advanced in payment of the potatoes by drafts drawn upon defendant's testator. The contract was in writing and under seal, was prepared by the attorney for defendant's testator and contained all of the agreements made by the parties thereto. An assistant of defendant's testator was the intermediary between plaintiffs and defendant's testator in securing the execution of the contract but was vested with no authority except to obtain the execution thereof and to supervise its performance. Plaintiffs, in this action to recover a balance claimed to be due them, contended that the terms of the written contract had been waived and modified so as to relieve them from full and proper performance and offered evidence of material waivers and changes made from time to time during the shipments by agreement between themselves and the assistant of defendant's testator. The admission of this evidence was error. Defendant's testator held his assistant out as his agent to do a particular act or class of acts, viz., to obtain the execution of the contract and supervise its performance. The plaintiffs were bound to find the measure of the agent's authority, not from his acts, but from the acts of his principal, and there is no evidence that defendant's testator by his conduct held out his agent as possessing any further power than was consistent with the strict enforcement of the written contract.

3. The contract in question is not ambiguous and the construction thereof is a question of law for the court; it was erroneous, therefore, for the trial court to permit the jury to pass upon its meaning.

4. Plaintiffs are not aggrieved by a reduction of the judgment in their favor which they stipulated to accept in preference to taking a new trial. Therefore, they have no right of appeal from such modification.

5. An additional allowance of costs is discretionary, even in difficult and extraordinary cases (Civ. Prac. Act, § 1513), and the Court of Appeals cannot review the allowance or disallowance of such additional costs, or say as matter of law that this was a difficult and extraordinary case.

*Dudley* v. *Perkins*, 202 App. Div. 824, reversed.

(Argued March 14, 1923; decided April 17, 1923.)

CROSS-APPEALS from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered July 8, 1922, modifying and affirming as modified a judgment in favor of plaintiffs entered upon a verdict. Plaintiffs appeal from so much of the judgment as struck out an additional allowance of costs and reduced the amount of recovery on their stipulation. Defendants appeal from the rest of the said judgment.

*Herbert A. Hemenway* for appellants and respondents. The interpretation of the meaning of the contract was for the court and it was error to leave the interpretation thereof to the jury. (1 Wait's Law & Practice [7th ed.], 42; *Brady* v. *Cassidy,* 104 N. Y. 147; *Glacius* v. *Black,* 67 N. Y. 563; *Whitney* v. *City of Olean,* 45 App. Div. 435; *Cohen* v. *Berlin & Jones Envelope Company,* 166 N. Y. 292; *Braxton* v. *Mendelson,* 233 N. Y. 122.) It was error to prevent Mr. McGrath from testifying as to the extent of his authority. (*Joseph* v. *Struller,* 25 Misc. Rep. 173; *Met. A. Mfg. Co.* v. *Lau,* 61 Misc. Rep. 105; *Norden* v. *Duke,* 106 App. Div. 514; *Brown* v. *Cone,* 80 App. Div. 413; *Flomerfelt* v. *Dillon,* 88 N. Y. Supp. 133; *Stuerewald* v. *Jackson,* 123 App. Div. 569; *Tiernan* v. *Havens,* 162 App. Div. 656.)

*Ernest E. Cole* and *James O. Sebring* for respondents and appellants. The trial court very properly submitted to the jury the question of the construction of the contract. (*White* v. *Hoyt,* 73 N. Y. 505; *Trustees of East Hampton* v. *Vale,* 151 N. Y. 463; *First National Bank* v. *Dana,* 79 N. Y. 108; *Kenyon* v. *K. T. & M. M. A. Assn.,* 122 N. Y. 247; *Stokes* v. *Mackay,* 140 N. Y. 640; *Staten Island S. B. Co.* v. *Spearin,* 149 App. Div. 854; *United States Rubber Company* v. *Silverstein,* 229 N. Y. 168; *Martin* v. *Crumb,* 216 N. Y. 500; *Moran* v. *Standard Oil Co.,* 211 N. Y. 187; *Nellis* v. *Western Life Indemnity Co.,* 207 N. Y. 320; *Gillett* v. *Bank of America,* 160 N. Y.

5.) The trial court properly ruled upon the questions asked of John W. McGrath, as to conversations had with George W. Perkins, his principal. (*Bliss* v. *Sherall*, 24 App. Div. 280; *Lowenstein* v. *Lombard*, 164 N. Y. 324; *Slaus Iron & S. Co.* v. *Jackson Iron Works*, 103 App. Div. 316; *Olcott* v. *Tioga Railroad Co.*, 27 N. Y. 546; *Glor* v. *Kelley*, 49 App. Div. 617; 166 N. Y. 489; Mechem on Agency, § 282; Story on Agency [8th ed.], § 256.)

POUND, J. George W. Perkins in the spring of 1917 made 485 written contracts with farmers in Steuben county whereby they agreed to raise potatoes and he agreed to purchase their crop at $1 per bushel, delivered at railroad stations. In the fall of 1917 Mr. Perkins sent his assistant, John W. McGrath, to Bath to find some one to handle and ship the potatoes he had purchased. He saw Egbert H. Dudley, one of the plaintiffs, who with his brother, the coplaintiff, were produce dealers, engaged in buying and selling potatoes at railroad stations where the potatoes were to be delivered. The result of this interview was the execution of a contract by Mr. Perkins and plaintiffs for the handling of the potatoes which Mr. Perkins had contracted for.

The material parts of the contract were that plaintiffs, parties of the second part, should sort, grade, load and ship the potatoes delivered by the various growers who had contracted with Mr. Perkins, party of the first part; that they should " guarantee that said potatoes as received at the several stations and as shipped by them to the party of the first part, shall be of full weight as shown by the records of the parties of the second part as having been received and receipted for by said parties of the second part to the growers of said potatoes with not more than a 2% shrinkage from said shipments of potatoes upon their arrival at their destination, namely, the city of New York or elsewhere.

" That all of the said potatoes as received and shipped

by the said parties of the second part be strictly in accordance with the contracts made between the party of the first part and the growers of said potatoes, and in particular, that said potatoes shall be ' Marketable,' free from mechanical or other injury, disease, scab or second growth or other defect that would render them unsalable, and must be of sufficient size not to pass through a sieve with a mesh of $1\frac{7}{8}$ inches; and that any and all of the potatoes shipped by the parties of the second part to the party of the first part, to the city of New York or elsewhere, which are not according to the requirements or standard as herein set forth, or as mentioned in said contracts made between the parties of the first part hereto and the growers of said potatoes, shall be chargeable to the parties of the second part for all defects as to quality or short weight or otherwise.

" Parties of the second part agree to furnish all the necessary labor incident to the work of grading, sorting, sacking, loading and shipping of said potatoes at their own cost and expense.

" That the said parties of the second part shall pay for the potatoes as delivered to and received by them at the various places or stations as mentioned in this contract, and when same are ready for shipment, and have been fully paid for upon the terms and conditions and at the price as set forth in the agreements between the party of the first part and the growers of said potatoes and not otherwise, then and in that event the said parties of the second part shall draw upon party of the first part for the necessary funds to cover the amount as expended by them, the form and manner of payment and the place where same shall be made to be as may be agreed upon between the parties to this agreement.

" That the said party of the first part agrees to pay to the party of the second part the sum of $5\frac{1}{2}$ cents for each and every bushel of marketable potatoes which the said parties of the second part ship to the said party of

the first part, and which may be received by the party of the first part as marketable potatoes, free from the defects as mentioned in this contract, and up to the standard of weight and size as also mentioned herein, and in addition thereto, that the said party of the first part will furnish the necessary sacks to contain the said potatoes and the twine necessary to secure the same in said sacks, or for the purpose of sewing the said sacks to safeguard the said potatoes in transporting or other necessary handling. And if the said potatoes are received in the city of New York or elsewhere, as may be directed by the said party of the first part, that is to say, up to standard as to the requirements mentioned herein, both as to quality and weight, then the said parties of the first part agree to pay to the said party of the second part, as additional compensation for the handling of said potatoes as provided for herein, one-half cent per bushel for each and every bushel of potatoes as shipped by the said parties of the second part, said additional compensation of one-half cent per bushel to be a bonus and an additional incentive for the said parties of the second part to ship only such marketable potatoes as may be handled advantageously by the said party of the first part. * * *

" In witness whereof the parties hereto have hereunto set their hand and seal, the 29th day of September, 1917.

> " GEORGE W. PERKINS [SEAL]
> " E. H. DUDLEY & CO.
> > " By E. H. DUDLEY, *Pres.* [SEAL]"

Plaintiffs received some potatoes from the growers, shipped them to New York, and advanced some money to pay for them. Their bill therefor, after crediting some payments made thereon, charging for their services at the rate of 5½ cents per bushel and making no claim for the one-half cent bonus, amounted to $2,724.82, for

which they brought suit. Defendant answered, denying performance of the contract and setting up counterclaims for shortage and other deductions.

The action was tried twice. On the first trial a verdict for $884.10 in favor of plaintiffs was set aside by consent of both parties. Thereafter Mr. Perkins died and his executors were substituted as defendants. On the second trial plaintiffs had a verdict for $1,943.57. From the judgment entered thereon plaintiffs accepted a deduction of $275, as the alternative of a new trial, which represents damages on potatoes, purchased by Mr. Perkins from two growers, which plaintiffs failed to sort and ship with proper diligence.

The unanimous affirmance, except as to the $275 item, relieves the court from the necessity of reviewing the voluminous record of the evidence to ascertain whether it supports the verdict, but certain assignments of error in the reception and exclusion of evidence and in the judge's charge require our attention.

Mr. Perkins was a man of large wealth. He was not in the potato business for gain. He was a banker and capitalist. So far as appears this venture was an isolated one on his part. His object in making these contracts was to put a supply of potatoes in the New York market to prevent profiteering and the high prices that prevailed in the fall of the year 1916. This philanthropic purpose does not serve to change his legal liability, but it has a bearing on the sufficiency of proof of waiver and modification of the terms of the written contract which were relied on by the plaintiffs to relieve them from full and proper performance on their part. Plaintiffs offered evidence of material waivers and changes made from time to time during the progress of the shipments by agreements between plaintiffs and McGrath, Mr. Perkins' agent. McGrath contradicted the plaintiffs, but the jury accepted plaintiffs' version. These modifications included an agreement to use a potato grader with a mesh of

1 13/16-inch instead of 1 14/16-inch, to change method of storing and shipping the potatoes and to permit other incidental deviations from the terms of the contract. Mr. Perkins was not connected with these changes except as it appeared that McGrath acted for him. Plaintiffs proceeded on the theory, which the courts below have accepted, that Mr. Perkins placed the entire potato business under the management of McGrath and that McGrath was his *alter ego* in all the transactions with them, having full authority, real or ostensible, to bind and loose. But McGrath did not make the original contract with plaintiffs. It does not appear that he had any power or control over it. It was executed by Mr. Perkins who took the utmost pains to have it carefully drawn by his own lawyer for his personal execution. It was in writing and under seal. Even if McGrath had been authorized to make this single contract for Mr. Perkins, that authority would not alone have implied an authority to modify it. (*Stilwell* v. *Mutual Life Ins. Co.*, 72 N. Y. 385.) Far less is such authority to be implied from the fact that McGrath was the intermediary between plaintiffs and his principal in securing the execution of the contract.

Mr. Perkins held McGrath out as his agent to do a particular act or class of acts, viz., to obtain the execution of the contract and to supervise its performance. He thereby vested McGrath ostensibly only with authority to do whatever was ordinarily incidental to the execution of these powers. Large incidental powers flow from a general agency, but a narrow limit of incidental authority attaches to a special agency. The burden is on the person dealing with the agent to show that the agent had the authority, real or ostensible, which he assumed to exercise. Such person should know that an agent, not acting generally in the ordinary course of a trade business or profession, but delegated to perform only a single act or group of acts, can possess but little authority

beyond the limits of the real authority. (Huffcut on Agency [2d ed.], 133.) Many cases use language to the effect that a special agent cannot bind his principal in a matter beyond or outside the power conferred, and that the party dealing with the special agent is bound to know the extent of his authority. (*Munn* v. *Commission Co.*, 15 Johns. 44, 54; *Rossiter* v. *Rossiter*, 8 Wend. 494, 497.) To dwell on the distinction between the implied powers of general and special agents in this regard is unprofitable. (*Mechanics Bank* v. *New York & New Haven R. R. Co.*, 13 N. Y. 599, 632.) For our purpose it is enough to say that plaintiffs were bound to find the measure of McGrath's authority, not from his acts, but from the acts of his principal. (*Edwards* v. *Dooley*, 120 N. Y. 540, 551.) Persons relying upon the agent's authority to modify by parol a solemn, sealed instrument after execution by the principal in person, do so at the risk of being bound by the contract as it was made. (See *Harris* v. *Shorall*, 230 N. Y. 343.) We fail to discover wherein Mr. Perkins by his conduct held out McGrath as possessing the power to modify the terms of the contract with plaintiffs, or possessing any further power than was consistent with the strict enforcement of the written contract. (*Messelback* v. *Norman*, 122 N. Y. 578.) The business world would be thrown into confusion if the very care which the principal exercised to limit the authority of his special agent should be distorted into a holding out of general powers. No one could safely act through agents with restricted powers if the doctrine of estoppel by conduct should be so broadly applied as it has been in this case. The court excluded evidence of McGrath's actual authority and received evidence of McGrath's acts and conversations under the theory that his implied authority was sufficiently established so that his principal was bound thereby. This was material error, calling for a reversal and a new trial.

For the guidance of the court on another trial, we

should consider the question whether the construction of the contract is for the court or the jury. The court allowed the jury to pass upon its meaning without exception, although defendant requested the court " to charge that the construction of the contract * * * is for the court and not for the jury." This request was not in proper form and the refusal thus to charge the jury was correct. But the contract is not ambiguous. It provides that plaintiffs shall guarantee deliveries in New York of full weight " with not more than a 2% shrinkage from said shipments upon their arrival at their destination, namely, the City of New York or elsewhere." It further provides that all defects as to quality, short weight or otherwise, shall be chargeable to the parties of the second part, and further provides that if the potatoes received in New York are up to standard of quality and weight then a bonus will be paid of one-half cent per bushel as " an additional incentive to the parties of the second part to ship only such marketable potatoes as may be handled advantageously by the said party of the first part." It thus appears that some variance of quality and weight on arrival at destination was contemplated and provided for, but, as an incentive to plaintiffs to minimize such deficiencies, additional compensation was provided if the potatoes shipped were up to standard. When the terms of a written contract are unambiguous, its proper construction presents a question of law for the court. (*Hartigan* v. *Casualty Co.*, 227 N. Y. 175.)

The questions raised by plaintiffs' appeal remain to be considered. They are not aggrieved by the reduction of the judgment in their favor which they stipulated to accept in preference to taking a new trial. Therefore, they have no right of appeal from such modification. (Civil Practice Act, § 557.) Nor was reversible error committed by striking out the additional costs. The allowance of such costs is discretionary, even in difficult and extraordinary cases (Civil Practice Act, § 1513), and

we cannot review the allowance or disallowance thereof, or say as matter of law that this was a difficult and extraordinary case.

The judgment should be reversed and a new trial granted, with costs to defendants, appellants, to abide the event. Plaintiffs' appeal dismissed, with costs.

HOGAN, CARDOZO, MCLAUGHLIN, CRANE and ANDREWS, JJ., concur; HISCOCK, Ch. J.. absent.

Judgment reversed, etc.